**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

NICHOLAS P. MUSCIO,              :
                                 :     Civil Action No. 02-1892 (DMC)
                Petitioner,      :
                                 :
        v.                       :     **OPINION**
                                 :
STATE OF NEW JERSEY, et al.,     :
                                 :
                Respondents.     :

**APPEARANCES:**

Petitioner pro se                Counsel for Respondents
Nicholas P. Muscio               Michael M. Rubbinaccio
#0297782                         Morris County Prosecutor
Lanesboro C.F.                   MR-0249
P.O. Box 280                     Records & Admin. Bldg.
Polkton, NC 28135                Third Floor
                                 P.O. Box 900
                                 Morristown, NJ 07963-0900

**CAVANAUGH,** District Judge

        Petitioner Nicholas P. Muscio has submitted a petition for a
writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging
his future incarceration pursuant to a conviction for first-
degree murder in the Superior Court of New Jersey, Law Division,
Morris County.  The respondents are the State of New Jersey and
the Attorney General of New Jersey.

        For the reasons stated herein, the Petition must be denied.

I.  BACKGROUND

A.  Factual Background

The relevant facts are set forth in the opinion of the Appellate Division.[1]

On January 2, 1988, around 3 a.m., the 17-year-old daughter of Joann Jenkins awakened and got out of bed. The daughter found her mother dead in a half-sitting position against the dining room wall of their first-floor apartment. Jenkins had a considerable amount of blood on her lap and groin area, and there was blood smeared on the wall and an adjoining china cabinet. Jenkins bled to death as the result of multiple stab wounds. A pathologist who examined Jenkins' body observed stab wounds to the lungs, liver, heart, chest elbow, and shoulder. One stab wound completely cut Jenkins' ribs. The pathologist testified the attack, "like a machine gun sort of stabbing," apparently began as Jenkins lay in bed. The death weapon was a large kitchen knife. The police found a fingerprint on the apartment kitchen window sill where the killer had removed a screen to gain access. They also found a purse under Jenkins' body. Nearby they found a poem written to Jenkins by her daughter.

A subsequent, unrelated investigation led police to defendant. The police executed a search warrant at defendant's residence. The warrant had issued in connection with an unrelated burglary. Newspaper articles found evidenced defendant's interest in Jenkins' death. The fingerprint found on Jenkins' kitchen window sill matched defendant's right thumbprint.

...

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

In addition to the evidence set forth at the outset of this opinion, the State presented evidence that around the time Jenkins' daughter found her mother dead, a woman in an adjoining apartment heard a long bang that sounded like it came from the Jenkins' apartment.  The neighbor also heard yelling and screaming and what "sounded like footprints on the sidewalk."

An investigating police officer called to the scene by the neighbor found the kitchen window wide open.  There was no screen on the window.  Based on "latent" "[f]abric impressions" found on the window sill, an FBI hair and fiber examiner concluded the window was the point of entry, a conclusion fostered by the fact that other windows and doors in the apartment were locked.

The pathologist testified the evidence disclosed Jenkins was stabbed while in bed.  He also stated he was surprised that Jenkins was able to walk from her bedroom to the dining room after she was stabbed.

When the local police executed the search warrant at defendant's residence, they came upon a copy of Jenkins' obituary and newspaper articles regarding her death, several other newspaper articles, and a magazine article entitled "Doing Time."  Pursuant to a second warrant, they seized the articles.

Police investigation disclosed defendant had been stopped by a local police officer for a traffic violation early in the morning of the murder.  At approximately 2:16 a.m., the officer stopped defendant for a minor traffic infraction.  Because the officer recognized defendant as the employee of a local 7-Eleven, the officer issued no summons.  The point at which the officer stopped defendant was approximately two-and-one-half miles, or approximately three minutes' driving time, from Jenkins' apartment.  Defendant resided about six miles, or a ten-minute drive, from the apartment in another direction.

The State offered the testimony of two prisoners, James Morais and Frederick Amerson, who both testified as to defendant's out-of-court inculpatory statements. Morais stated that he first met defendant in a county jail in New Jersey in September 1989, where defendant

3

had talked about the Jenkins murder.  Morais testified
that defendant told him that on the night of the murder
he parked in the Dunkin Donuts parking lot, walked to
Jenkins' apartment, entered through the kitchen wndow,
and killed her.  Morais also testified to the
following:

> First thing [defendant] did he said he found
> the purse.  It was over by the front door I
> believe he said.  He took the purse, laid it on
> the dining room table, looked through what was
> there, some photographs.  He got a knife from the
> kitchen.  He went into a bedroom.  This lady was
> sleeping there.  He watched her for about five or
> seven minutes something like that and then he
> stabbed her.  I think he said he did it about
> eleven or 12 times.  He left her there for dead.

> At that time he went back out.  He got this
> thing.  He said he had a power surge or something.
> He was on a trip of some kind, power trip.  He
> left the bedroom, went back out, was looking
> through her purse and things I guess as being in
> the living room, kitchen area, looked at her
> photographs and he had an obsession with a poem
> but the lady came out of the bedroom.  He shoved
> her up against the wall or cabinet or something
> and ran out the front door.  He made it back to
> his car.  Told me that he threw away some gloves
> that he had and that he went home.  That's what he
> told me.

Amerson stated that he was in prison in 1994 and shared
a cell with defendant.  According to Amerson, defendant
told him that he watched Jenkins through the window and
"masturbat[ed] outside the window."  Amerson also
testified that defendant told him that the following
occurred:

> He went through the kitchen window.  He got a
> knife from the kitchen.  He went into the lady's
> bedroom [and] started masturbating over her.  At
> some point she woke up.  He stabbed her he told me
> 13 times so hard that he was breaking bones.  And
> at one point the knife went through the lady's arm
> and into her chest.  He said that the bitch
> wouldn't die.  Managed to get up, went down the
> hallway and collapsed in the dining room.

4

According to Amerson, defendant entered Jenkins' apartment looking for pictures.  Defendant also told Amerson taht he was wearing plastic gloves that he had from the 7-Eleven.  Amerson testified that he waited until October 1994 to come forward with this information because that was when he discovered that defendant had stolen pictures of his family.

At the time of the murder, defendant was married to Kim Muscio.  At the time of this trial, they were divorced.  The ex-wife, now Kim Heller, testified that in January 1988 defendant worked at the 7-Eleven and a PhotoMat.  Although the parties stipulated that defendant did not work at the 7-Eleven on January 1 or 2, 1988, Heller stated that on January 1, 1988, at approximately 10:45 p.m., defendant told her that he was going to work and that at approximately 3 a.m. he returned and woke her.  According to Heller, defendant said, "I just murdered somebody, killed somebody." Heller stated that defendant told her that he had cut a window screen and entered a woman's apartment through the window and stabbed her with a knife.  According to Heller, defendant told her that after he stabbed the woman, "he had woke up and realized that he had stabbed somebody and that he heard a noise, so he left her slumped against the wall and left."  Heller testified that the following morning defendant told her the following:

> He told me the story again that, you know, he had killed somebody.  And he showed me the shirt that he was wearing, the red flannel shirt.  And he showed me the sleeve where there was some marks they looked like dirt, you know, dirty smudge marks.  And he said that that was, you know, blood.

> And we went outside to the car, he showed me on the floor of the car there's like a hump between the two front seats and said that he had wiped his hands on the carpet there.  And there were dirty smudge marks there but the car was really old I couldn't tell, you know, what it was or anything.

Heller also testified defendant kept a pair of surgical gloves in his jewelry box in the bedroom.  According to

5

Heller, defendant told her that "after he had gotten into the apartment he had put the gloves on.  And that he discarded them after he had left."

Heller further stated that the morning after the murder defendant purchased three newspapers, and she helped him cut out articles regarding the Jenkins murder. Defendant kept these articles in his jewelry box along with Jenkins' obituary.

Heller offered the following testimony regarding defendant's behavior when their house was searched by the police in September 1988:

> He took me by the arm into the hall and told me, walk quick and hurry, that if they say anything about the articles to say that they were for Chris Littlewood.  Chris Littlewood was a girlfriend of my little brother[] and supposedly she had known the daughter or something.

As part of his defense, defendant tried to create reasonable doubt by alleging that Jenkins' boyfriend murdered her.  Jenkins' daughter testified that her mother's boyfriend was Russ Bloodworth and that her mother was depressed about her relationship with him.

Defendant's mother-in-law testified as an alibi witness.  Defendant and his then wife lived with the mother-in-law.  The mother-in-law testified defendant came home the morning of the murder between 2 and 3 a.m.  Defendant told her he had gone for his usual walk to the 7-Eleven store.

Confronted with the foregoing evidence, the jury returned a verdict of guilt on the purposeful and knowing murder.

(State v. Muscio, Superior Court of New Jersey, Appellate

Division, A-3947-95T4, Opinion at 1-.)

A.    Procedural History

Indictment No. 89-08-0993-I charged Petitioner with murder,

in violation of N.J.S.A. 2C:11-3, burglary, in violation of

N.J.S.A. 2C:18-2, and felony murder, in violation of 2C:11-3.
Petitioner was tried before a jury in May 1991 and convicted on
all three counts.  Petitioner was sentenced to an aggregate term
of life plus 20 years and a 40-year parole disqualifier.  On
appeal, the conviction was reversed and remanded for new trial.

On re-trial, in October 1995, the jury convicted Petitioner
of murder, but acquitted him of burglary and felony murder.
Petitioner was sentenced to imprisonment for life with a 30-year
parole disqualifier.  The sentence was ordered to run
consecutively to the sentence Petitioner was then serving in
North Carolina.

On April 28, 1998, the Appellate Division affirmed the
conviction and sentence.  On September 24, 1998, the Supreme
Court of New Jersey denied certification.  State v. Muscio, 156
N.J. 410 (1998).  On April 19, 1999, the United States Supreme
Court denied certiorari.  Muscio v. New Jersey, 526 U.S. 1073
(1999).

Petitioner timely filed a petition for post-conviction
relief in the trial court, which was denied on February 13, 2002.
Petitioner did not appeal the denial of his petition for post-
conviction relief.

This Petition is dated March 25, 2002, and was received in
this Court on April 12, 2002.

Respondents have Answered.  Petitioner has not replied.
This matter is now ripe for determination.

II.   <u>28 U.S.C. § 2254</u>

As amended by the Antiterrorism and Effective Death Penalty
Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent
part:

> (a) The Supreme Court, a Justice thereof, a circuit
> judge, or a district court shall entertain an
> application for a writ of habeas corpus in behalf of a
> person in custody pursuant to the judgment of a State
> court only on the ground that he is in custody in
> violation of the Constitution or laws or treaties of
> the United States.

With respect to any claim adjudicated on the merits in state
court proceedings, the writ shall not issue unless the
adjudication of the claim

> (1) resulted in a decision that was contrary to,
> or involved an unreasonable application of, clearly
> established Federal law, as determined by the Supreme
> Court of the United States; or

> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court
precedent "if the state court applies a rule that contradicts the
governing law set forth in [Supreme Court] cases," or "if the
state court confronts a set of facts that are materially
indistinguishable from a decision of th[e] Court and nevertheless
arrives at a result different from [the Court's] precedent."

8

Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J.,
for the Court, Part II).  A state court decision "involve[s] an
unreasonable application" of federal law "if the state court
identifies the correct governing legal rule from [the Supreme]
Court's cases but unreasonably applies it to the facts of the
particular state prisoner's case," and may involve an
"unreasonable application" of federal law "if the state court
either unreasonably extends a legal principle from [the Supreme
Court's] precedent to a new context where it should not apply or
unreasonably refuses to extend that principle to a new context
where it should apply," (although the Supreme Court expressly
declined to decide the latter).  Id. at 407-09.  To be an
"unreasonable application" of clearly established federal law,
the state court's application must be objectively unreasonable.
Id. at 409.  In determining whether the state court's application
of Supreme Court precedent was objectively unreasonable, a habeas
court may consider the decisions of inferior federal courts.
Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits
of a claim is entitled to § 2254(d) deference.  Chadwick v.
Janecka, 302 F.3d 107, 116 (3d Cir. 2002) (citing Weeks v.
Angelone, 528 U.S. 225, 237 (2000)).  With respect to claims
presented to, but unadjudicated by, the state courts, however, a
federal court may exercise pre-AEDPA independent judgment.  See

9

Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000),
cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL
1523144, *6 n.4 (D.N.J. 2000).  See also Schoenberger v. Russell,
290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and
cases discussed therein).

     Although a petition for writ of habeas corpus may not be
granted if the Petitioner has failed to exhaust his remedies in
state court, a petition may be denied on the merits
notwithstanding the petitioner's failure to exhaust his state
court remedies.  See 28 U.S.C. § 2254(b)(2); Lambert v.
Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v.
Pinchak, 348 F.3d 355, 357 (3d Cir. 2003).

     Finally, a pro se pleading is held to less stringent
standards than more formal pleadings drafted by lawyers.  Estelle
v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S.
519, 520 (1972).  A pro se habeas petition and any supporting
submissions must be construed liberally and with a measure of
tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998);
Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989);
United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969),
cert. denied, 399 U.S. 912 (1970).

III.   ANALYSIS

A.   Evidentiary Rulings

It is well-established that the violation of a right created by state law is not cognizable as a basis for federal habeas relief.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'" (quoting Lewis v. Jeffers, 497 U.S. 764, 680 (1990))).  Accordingly, Petitioner cannot obtain relief for any errors in state law evidentiary rulings, unless they rise to the level of a deprivation of due process.

For a habeas petitioner to prevail on a claim that an evidentiary error amounted to a deprivation of due process, he must show that the error was so pervasive as to have denied him a fundamentally fair trial.  United States v. Agurs, 427 U.s. 97, 108 (1976).

1.   Admission of the Article about "Doing Time"

The trial court admitted into evidence an newspaper article on "Doing Time," which discusses how a convicted felon can adjust to imprisonment.  The trial judge also gave a limiting instruction that "the sole reason why this article was received in evidence was because the jury could consider the article bearing upon a question of the post-crime state of mind of the defendant as evidence of his guilt.  ...  Obviously you may or may not draw that inference from the existence of the article."

11

In his arguments to the jury, defense counsel had admitted that his client was a burglar, and sought to vitiate the significance of this clipping and others by relating them to Petitioner's other criminal activities.

Petitioner contends that "[t]he trial court committed reversible error by allowing the jury to consider an article found in defendant's residence about "Doing Time" as an inference of his consciousness of guilt and compounded the error of the article's admission by delivering a woefully inadequate limiting instruction."[2]

The Appellate Division found that there was no error under state law, including an analysis of whether the admission of the article deprived Petitioner of a fair trial. Here, also, Petitioner asserts the claim solely in terms of state law, which does not provide a basis for relief under § 2254. In any event, to the extent the Petition could be construed to allege a due process violation arising out of the admission of this evidence, such a claim is meritless. The article was relevant to Petitioner's consciousness of guilt, it was kept with other clippings related to the murder, and it was not so prejudicial as to outweigh its probative value. There was no denial of due process from the admission of this article.

_____

[2] This claim was exhausted on direct appeal.

12

2.    <u>Ex-Wife's Testimony as Ex Post Facto Violation</u>

Petitioner's wife apparently did not testify, because of the marital communication privilege, at Petitioner's first trial. Between the time of Petitioner's first and second trials, the New Jersey legislature amended the marital communication privilege to permit disclosure of marital communications "in a criminal action or proceeding in which either spouse consents to the disclosure." <u>See</u> N.J.R.E. 509, N.J.S.A. 2A:84A-22; <u>State v. Szemple</u>, 135 N.J. 406 (1994).  At Petitioner's second trial, Petitioner's ex-wife testified as to certain confidential communications between them, including his statements to her that he had murdered the victim and what to say about the clippings.  She also testified that Petitioner kept articles about the victim in his jewelry box.

Petitioner contends that the admission of his ex-wife's testimony at his re-trial, permitted by the change in the marital privilege, constitutes an ex post facto violation.[3]

Without relying on any federal case law, the Appellate Division rejected Petitioner's federal constitutional claim.

> Changes to evidentiary rules enacted after the commission of a crime are not <u>ex</u> <u>post</u> <u>facto</u> laws unless they are a pretense for depriving a defendant of a "substantial right."  <u>See</u> <u>State v. Gadsden</u>, 245 N.J. Super. 93, 97 (App. Div. 1990).  The privilege amendment here simply modified the scope of evidence that may be admitted during a criminal trial and did not alter any substantive right of the defendant.  <u>See</u> <u>State v. Muhammad</u>, 145 N.J. 23, 57 (1996).

_____

[3] This claim was exhausted on direct appeal.

13

(App. Div. Opinion at 26-27.)

Although the Appellate Division did not identify the applicable Supreme Court precedent, it did reach the correct result.  The core concerns of the Ex Post Facto Clause were expounded upon by Justice Chase in 1798.

> 1st.  Every law that makes an action done before the passing of the law, and which was <u>innocent</u> when done, criminal; and punishes such action.  2d.  Every law that <u>aggravates</u> a <u>crime</u>, or makes it <u>greater</u> than it was, when committed.  3d.  Every law that <u>changes the punishment</u>, and inflicts a <u>greater punishment</u>, than the law annexed to the crime, when committed.  4th.  Every law that alters the <u>legal</u> rules of <u>evidence</u>, and receives less, or different, testimony, than the law required at the time of the commission of the offence, <u>in order to convict the offender</u>.

<u>Calder v. Bull</u>, 3 Dall. 386, 390 (1798) (opinion of Chase, J., emphasis in original) (quoted with approval in <u>Collins v. Youngblood</u>, 497 U.S. 37, 41-42 (1990)).

It is the fourth category of ex post facto protection that is at issue here.  Contrary to Petitioner's position, however, the Supreme Court has long held that changes in witness competency statutes do not run afoul of the Ex Post Facto Clause.

> Statutes which simply enlarge the class of persons who may be competent to testify in criminal cases are not <u>ex post facto</u> in their application to prosecutions for crimes committed prior to their passage; for they do not ... alter the degree, or lessen the amount or measure, of the proof which was made necessary to conviction when the crime was committed.

<u>Hopt v. Territory of Utah</u>, 110 U.S. 574, 589-90 (1884) (upholding change in rules of evidence which permitted testimony by a

14

convicted felon) (quoted with approval in Carmell v. Texas, 529
U.S. 513, 543-44(2000)).  See also Thompson v. Missouri, 171 U.S.
380 (1898) (upholding change in rules of evidence permitting
expert testimony) (cited with approval in Carmell, 529 U.S. at
542-46).

Based upon these long-standing precedents, it is clear that
the change in New Jersey law altering the marital privilege does
not violate the Ex Post Facto Clause.  Cf. Palmer v. Clarke, 408
F.3d 423 (8th Cir. 2005) (change in Nebraska's marital privilege
law permitting wife to testify at defendant's re-trial did not
violate Ex Post Facto Clause).

3.  Discovery Violation

During Petitioner's trial, a police detective testified that
he conducted a "test" during the investigation, to evaluate
whether a large man could get into the apartment through the
kitchen window without disturbing anything.  Information about
this test had not been provided to Petitioner prior to the
testimony.  In response to the defense request for a mistrial,
the trial judge gave the prosecutor till the end of the day to
supply the defense with the information.  Petitioner contends
that this discovery violation deprived him of due process.

This claim was not exhausted in the state court.  It is,
however, meritless.  Again, a violation of state law is not alone
a basis for relief under § 2254.  In view of the substantial

evidence supporting Petitioner's guilt, and his failure even to describe any injury flowing from any violation of state discovery rules, it cannot be said that this discovery violation deprived Petitioner of a fair trial.

B.   <u>Jury Instructions</u>

Generally, a jury instruction that is inconsistent with state law does not merit federal habeas relief.  Where a federal habeas petitioner challenges jury instructions given in a state criminal proceeding,

> [t]he only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record.  In addition, in reviewing an ambiguous instruction ..., we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.  And we also bear in mind our previous admonition that we "have defined the category of infractions that violate 'fundamental fairness' very narrowly."  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."

<u>Estelle v. McGuire</u>, 502 U.S. 62, 72-73 (1991) (citations omitted).  Thus, the Due Process Clause is violated only where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law."  <u>Smith v. Horn</u>, 120 F.3d 400, 416 (1997).  <u>See also</u> <u>In re Winship</u>, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond

16

a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); Sandstrom v. Montana, 442 U.S. 510, 523 (1979) (jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the constitutional rights of the accused).

Where such a constitutional error has occurred, it is subject to "harmless error" analysis. Smith v. Horn, 120 F.3d at 416-17; Neder v. United States, 527 U.S. 1, 8-11 (1999). "[I]f the [federal habeas] court concludes from the record that the error had a 'substantial and injurious effect or influence' on the verdict, or if it is in 'grave doubt' whether that is so, the error cannot be deemed harmless." Id. at 418 (citing California v. Roy, 519 U.S. 2, 5 (1996)). In evaluating a challenged instruction,

> a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. If the charge as a whole is ambiguous, the question is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.

Middleton v. McNeil, 124 S.Ct. 1830, 1832 (2004) (internal quotations and citations omitted).

The jury instruction at issue here involves the credibility of witnesses. Specifically, the trial court instructed:

> As to the testimony of two of the witnesses, Mr. Amerson and Mr. Morais, it was brought out on direct or

> cross-examination or both that they have previously
> been convicted of crimes or a crime ... .  You may,
> should you choose to do so, consider the fact of a
> prior conviction or convictions as bearing upon the
> credibility of a witness.  That is, you may consider
> the prior conviction in assessing credibility, but
> you're under no compulsion to lower your estimates of a
> witness's credibility because of the conviction.  In
> short, in considering prior convictions you may or you
> may not conclude that the credibility of a witness has
> been affected and to what extent.

Petitioner challenges the jury instruction as to the credibility
of witnesses on two separate grounds: that the instructions
should also have talked about how criminal witness expectations
of favorable treatment in return for testimony affects
credibility, and that the instructions should have discussed
credibility as it relates to witnesses repeating out-of-court
statements made by the defendant.[4]  Each of Petitioner's
challenges to the jury instructions is evaluated individually,
below, pursuant to this standard.

    1.   <u>Instructions Regarding Witness Expectations</u>

    Petitioner contends that each of the witnesses who testified
as to out-of-court statements made by Petitioner was subject to
conviction or pending charges, and that the trial court should
have instructed the jurors regarding the effect of the witnesses'
actual or perceived expectation of favorable treatment by the
government in return for their testimony.  Petitioner contends

---

    [4] These claims were exhausted on direct appeal.

that the failure to issue such an instruction deprived him of a fair trial and due process.

Without explanation, the Appellate Division found this contention to be without merit.

To the extent there was an error of state law with respect to the jury charge, that error is not a grounds for federal habeas relief.  Moreover, it cannot be said that any such error deprived Petitioner of due process or a fair trial.  At trial, Petitioner's counsel elicited from each of the witnesses testimony about their criminal backgrounds, pending charges, dismissed charges, expectations of future plea bargains, and even the ex-wife's motivation to lie because of a custody dispute. (See, e.g., Tr. of Oct. 30, 1995, at 33-38; Tr. of Oct. 26, 1995, at 68-72, 91-97.)  In addition, at summation, Petitioner's counsel again emphasized the possible expectations of these witnesses and potential motivations to provide false testimony in return for favorable treatment.  Even if, under state law, the Court should have provided an instruction on point, the jury was made aware of the challenges to the witnesses' credibility based upon their possible expectations of favorable treatment. Petitioner was not deprived of a fair trial as a result of any defect in the jury instructions on this issue.

19

2.   <u>Instructions Regarding Out-of-Court Statements</u>

Petitioner contends that the trial court should have instructed the jurors that they must find his out-of-court statements to his ex-wife and the jailhouse snitches credible before considering them and must treat testimony about oral statements with caution.  He contends that the failure to provide such an instruction deprived him of due process and a fair trial.

The Appellate Division found that there was no violation of state law with respect to this issue.  The Appellate Division found that "the trial court's credibility charge, when considered in the context of the emphasis counsel directed to the issue of the credibility of the three witnesses, makes it infinitely clear the jury had to be aware of the need to be very circumspect in its assessment of credibility."  (App. Div. Opinion at 19-20.) The Appellate Division noted also that other evidence provided substantial indicia of the reliability and trustworthiness of the witnesses' versions of Petitioner's out-of-court statements, including the consistency of the various statements, the location of Petitioner's fingerprint on the kitchen window sill but no fingerprints in the apartment (because Petitioner wore gloves), the evidence regarding the location of the purse and poem, and the physical evidence related to the stabbing and the location of the victim.  The same corroborating evidence establishes that whether or not there was an error of state law with regard to

20

this instruction, there was no deprivation of a fair trial or due process.

C.   Ineffective Assistance of Counsel

The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The right to counsel is "the right to effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970) (emphasis added).

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show both that his counsel's performance fell below an objective standard of reasonable professional assistance and that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome would have been different. Strickland v. Washington, 466 U.S. 668, 687, 694 (1984). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." Strickland at 694. Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.

The Performance and prejudice prongs of <u>Strickland</u> may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." <u>Id.</u> at 697.

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Strickland</u>, 466 U.S. at 689. As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." <u>Id.</u> at 690-91. If counsel has been deficient in any way, however, the habeas court must determine whether the cumulative effect of counsel's errors prejudiced the defendant within the meaning of <u>Strickland</u>. <u>See</u> <u>Berryman v. Morton</u>, 100 F.3d 1089, 1101-02 (3d Cir. 1996).

1.   <u>Trial Counsel</u>

Petitioner contends that he was deprived of the effective assistance of trial counsel by his counsel's failure to present "an obvious psychiatric defense."[5] Petitioner basis this argument on the testimony of his ex-wife that Petitioner told her

---

[5] Petitioner presented this claim to the state courts in his motion for post-conviction relief, but did not appeal the denial of relief.

he "woke up" following the murder and that he suffered from epileptic seizures.  The trial court rejected this claim, although the parties have not provided this Court with a copy of that decision, and Petitioner did not appeal.

The defense of mental disease or defect is at odds with the defense actually provided at trial that Petitioner had not killed the victim.  The mental disease or defect defense would rest upon an admission that the defendant <u>did</u> kill the victim, but lacked the requisite mens rea for criminal responsibility.

Moreover, Petitioner did not present to the state court or to this Court any evidence suggesting that a defense of mental disease or defect under N.J.S.A. 2C:4-2 would have been viable. He has identified no expert witnesses who would testify as to the existence of a mental disease or defect, he has presented no affidavits, he has not even identified the mental disease or defect from which he claims to suffer.

Thus, Petitioner has failed to present any evidence either that trial counsel's performance fell below an objective standard of reasonableness or that the outcome of the trial would have been different but for counsel's deficiencies.  Petitioner is not entitled to relief on this claim.

2.   <u>Appellate Counsel</u>

Petitioner alleges that his appellate counsel was ineffective, presumably for failure to raise the same claim of

23

mental disease or defect.[6]  Again, this Court has before it no state court decision on this issue.

The Supreme Court has held that the Due Process Clause of the Fourteenth Amendment guarantees a defendant the effective assistance of counsel on a first direct appeal as of right. Evitts v. Lucey, 469 U.S. 387 (1985).  The Strickland standard for effective assistance of counsel applies to appellate counsel. See Lewis v. Johnson, 359 F.3d 646, 656 (3d Cir. 2004). Appellate counsel does not have a duty to advance every nonfrivolous argument that could be made, see Jones v. Barnes, 463 U.S. 745, 754 (1983), but a petitioner may establish that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker," Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).

For the same reason that this Court found no violation of Petitioner's right to effective assistance of trial counsel, there was no violation of Petitioner's right to effective assistance of appellate counsel.  Most importantly, the defense of mental disease or defect conflicts with the defense that Petitioner did not kill the victim.

---

[6] Petitioner presented this claim to the state courts in his motion for post-conviction relief, but did not appeal the denial of relief.

D.   <u>Prosecutorial Misconduct</u>

The U.S. Supreme Court has recognized the obligation of a prosecutor to conduct a criminal prosecution with propriety and fairness.

> He may prosecute with earnestness and vigor - indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. ...  Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

<u>Berger v. United States</u>, 295 U.S. 78, 88 (1935).  "The line separating acceptable from improper advocacy is not easily drawn; there is often a gray zone.  Prosecutors sometime breach their duty to refrain from overzealous conduct by commenting on the defendant's guilt and offering unsolicited personal views on the evidence."  <u>United States v. Young</u>, 470 U.S. 1, 7 (1985).

> The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

<u>Id.</u> at 18.

Under U.S. Supreme Court precedent, where a prosecutor's opening or closing remarks are challenged in habeas, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)).  In evaluating the likely effect of improper comments, a court may consider whether the improper comments were invited by or responsive to prior comments by opposing counsel. Darden, 477 U.S. at 181-82.  Thus, "Supreme Court precedent counsels that the reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001).

Here, Petitioner contends that the prosecutor improperly vouched for the credibility of the state's witnesses and by exclaiming Petitioner's guilt in front of the jury.[7]

In his opening, the prosecutor stated:

> And you're going to hear some evidence that's going to be disturbing, that's going to come before you and it's going to come from somebody who's in jail, and you're going to say, can I trust this evidence.  I'm going to tell you you can. ...

---

[7] Petitioner exhausted this claim on direct appeal.

26

During his summation, defense counsel challenged the credibility
of the three witnesses who had testified as to Petitioner's out-
of-court statements, pointing out that they had incentives to
"make a deal."   In addition, he pointed out that Petitioner's ex-
wife also was not credible because she stayed with him for two
years after he allegedly confessed the murder to her and because
she had an incentive to keep her husband away from their child.
In response, in his summation, the prosecutor stated that one of
the criminal defendants was not receiving any favorable treatment
from New Jersey authorities and, with respect to Petitioner's ex-
wife, that:

> But it is true he killer her and it is true he told
> [his ex-wife].  And you saw her testify on the stand,
> you saw her.  I don't have to tell you, you're going to
> tell me, she was credible, she was believable.  Do you
> think she's going to send him to jail for life on a
> whim?  Do you think she's going to do that because she
> had some small drug case disposed of?  Do you think she
> was going to go to jail for that?  Do you think that
> was a concern?

Relying on state precedent for the proposition that "[t]he
general rule is that '[p]rosecutorial misconduct is not ground
for reversal of a criminal conviction unless the conduct was so
egregious that it deprived defendant of a fair trial,'" and that
"the prosecutor may not insert his or her personal views as to a
witness's credibility or refer to matters outside the record to
support the witness's testimony," the Appellate Division rejected
this claim.  The Appellate Division found that "although the

27

prosecutor commented on the witnesses' credibility in his opening and closing statements, he did not vouch for them.   The prosecutor did not suggest that he was relying on knowledge or information outside the record, and his closing comments were based on what occurred in the courtroom."   In addition, "[t]he prosecutor's closing statements were in direct response to comments by defense counsel in his closing argument."   (App. Div. Opinion at 21-25.)

Although not explicitly relying upon the applicable Supreme Court precedent, the Appellate Division accurately set forth the standard against which the prosecutor's statements are to be tested.   Here, the prosecutor did not suggest that he had personal knowledge outside of the record regarding the truthfulness of the witnesses.   His comments were directly related to the issues surrounding credibility that had been raised by defense counsel.   Moreover, in light of the overall conduct of the trial and the other evidence of Petitioner's guilt, there was no denial of due process.   Petitioner is not entitled to relief on this claim.

E.   Denial of Access to Courts

Petitioner claims that he has been denied access to the courts because of his incarceration in another state.   He contends that this prevented him from appealing the denial of post-conviction relief.

Petitioner does not identify any action taken by the authorities where he is presently incarcerated to prevent him from appealing the denial of his motion for post-conviction relief.  Moreover, as this Court has found no merit to the claim of ineffective assistance of counsel that was raised in the motion for post-conviction relief, and as this Court has addressed the claim on the merits, Petitioner has not suffered any injury from the failure to appeal.  Accordingly, Petitioner is not entitled to any relief based upon this claim.

IV.  <u>CERTIFICATE OF APPEALABILITY</u>

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003).

Petitioner has failed to make a substantial showing of the denial of a constitutional right.

## V.   CONCLUSION

For the reasons set forth above, the Petition must be denied.  An appropriate order follows.


Dennis M. Cavanaugh
United States District Judge

Dated: 10/12/05